UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

          Plaintiff,

 -v-

UWE MUELLER,

          Defendant.

No. 14-CV-9221 (KMK)

OPINION & ORDER

Appearances:

Jerome P. Coleman, Esq.
Barbara M. Maisto, Esq.
Steven A. Zuckerman, Esq.
Putney Twombly Hall & Hirson LLP
New York, NY
*Counsel for Plaintiff*

Daniel Turinsky, Esq.
Eric J. Wallach, Esq.
DLA Piper US LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

 Plaintiff International Business Machines Corporation ("IBM" or "Plaintiff") brings this Action against Defendant Uwe Mueller ("Defendant" or "Mueller"), alleging that it is due $1,114,088 for the value of the gain received by Defendant for stock options and equity awards previously granted during the course of Defendant's employment. (*See generally* Compl. (Dkt. No. 1).) Before the Court is Defendant's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). For the reasons to follow, Defendant's Motion is denied.

I. Background

A. Factual Background

The following facts are drawn from Plaintiff's Complaint, and are taken as true for the purpose of resolving the Motion.

IBM is a New York corporation, organized under the laws of the State of New York and with its principal place of business in New York. (*See* Compl. ¶ 1.) Defendant, a citizen of the Republic of Germany, is a former employee of IBM, who served as a Managing Director for IBM in Munich, Germany and was responsible for selling IBM products and services to the BMW Group. (*See id.* ¶¶ 2–3.) While employed with IBM, Defendant participated in the IBM 2001 Long–Term Performance Plan (the "Performance Plan") and various Equity Award Agreements ("EAAs"), wherein he received stock options and equity awards (collectively, "Awards") pursuant to the Terms and Conditions of "Your Equity Award: Effective June 8, 2011" ("Terms and Conditions," collectively with the Awards, the "Award Agreements"). (*Id.* ¶¶ 4, 13.) According to Plaintiff, the purpose of the Performance Plan was to "attract, motivate and retain selected employees . . . by making long-term incentive and other awards under the Plan, thereby providing Participants with a proprietary interest in the growth and performance of the Company." (*Id.* ¶ 8.)

The Award Agreements each contain cancellation and rescission provisions that the Parties each agreed to as part of the distribution of any such Awards delivered in the course of employment at IBM. Section 13(a) of the Performance Plan provides, in relevant part:

> [IBM] may cancel, rescind, suspend, withhold, or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time . . . if the Participant engages in any 'Detrimental Activity.' For the purposes of this Section 13, 'Detrimental Activity' shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services

> to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interests of the Company.

(*Id.* ¶ 15 (emphasis omitted).) Section 13(b) of the Performance Plan covers those Awards that have already been granted and provides that if a Participant "fails to comply with [Section 13(a)] prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise, payment or delivery." (*Id.* ¶ 16.) This Rescission Period is defined in the EAAs as the 12 months immediately following "any exercise, payment or delivery pursuant to an Award." (*Id.* ¶ 45.) These EAAs establish additional terms and conditions by which "IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict [the Awards]" if Defendant were to "render services for a competitor prior to, or during the Rescission Period." (*Id.* ¶ 17.) Acceptance of the Awards is contingent upon this "Cancellation and Rescission" portion of the EAAs. (*Id.* ¶ 18.)

The Performance Plan further specifies in Section 15(e) that the Performance Plan and all EAAs are governed by New York law and that recipients of Awards have submitted to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve disputes arising out of, or related to, the Performance Plan or any related EAAs. (*See id.* ¶ 33; *see also* Aff. of Catherine Hall in Supp. Of Def.'s Mot. To Dismiss ("Hall Aff.") Ex. A ("Performance Plan") at 9 (Dkt. No. 32).)[1] The Terms and Conditions incorporated into the EAAs include nearly identical language to that of the Performance Plan. (*See* Compl. ¶ 34; *see also* Hall Aff. Ex. Ex. C ("2003–2007 EAAs"), D ("Terms and Conditions") at 4, E

---

[1] The Court may consider this exhibit even though it was not attached to the Complaint because it is integral to the Complaint. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relied heavily upon its terms and effect, thereby rendering the document integral to the complaint." (internal quotation marks omitted)).

3

("2011 EAA").)[2] Both documents also provide that a recipient of Awards must pay all costs and expenses incurred by Plaintiff, including reasonable attorney's fees, in the event that Plaintiff prevails in an action to enforce the Performance Plan terms of any EAAs. (*See* Compl. ¶ 35–36.)

In 2011, Defendant began to exercise the Awards he had received between 2003 and 2007. (*See id.* ¶ 31; *see also* Hall Aff. Ex. F ("Stock Exercise Confirmations").)[3] Specifically, Defendant exercised nonqualified stock options on April 21, 2011 resulting in a gain in the amount of $122,552. (*See* Compl. ¶¶ 23–24.) Four days later, on April 25, 2011, Defendant exercised additional nonqualified stock options valued at $441,222. (*See id.* ¶¶ 25–26.) Then, on December 5, 2011, Defendant exercised the final nonqualified stock options at issue, valued at $505,643. (*See id.* ¶¶ 27–28.) Additionally, on June 8, 2011 Defendant exercised 654 restricted stock units ("RSUs") that were valued at $44,672. (*See id.* ¶¶ 29–30.) By the end of 2011, after the exercise of these Awards, Defendant had realized a total gain of $1,114,088. (*See id.* ¶ 32.) Defendant proceeded to terminate his employment with IBM on March 31, 2012. (*See id.* ¶ 9.) He soon thereafter commenced employment with Ernst & Young ("EY") in April 2012, which Plaintiff determined to be Detrimental Activity under Section 13(a) of the Performance Plan occurring within the 12 month Rescission Period. (*See id.* ¶¶ 10, 12, 31, 37.) Via letter dated May 11, 2012, Plaintiff notified Defendant that, on the basis of this determination, it had rescinded the gains received and demanded that Defendant repay the $1,114,088.22 in Awards that had been paid during the Rescission Period by June 15, 2012. (*See id.* ¶¶ 39–40.)

---

[2] The Court also deems the respective EAAs and their Terms and Conditions integral to the Complaint, and thus may be considered in deciding this motion.

[3] The Court deems the Stock Exercise Confirmations regarding the Awards at issue integral to the Complaint.

Plaintiff alleges that it is due payment in the amount of $1,114,088, as well as all costs, expenses, and fees incurred by Plaintiff in connection with this Action, as Plaintiff alleges it is owed and entitled to payment in the total amount of the gain received through exercise of the Awards. (*See id.* ¶¶ 54–56.)

B. Procedural Background

Plaintiff initiated this Action by filing the Complaint on November 20, 2014. (*See* Dkt. No. 1.) On August 12, 2015, counsel for Defendant submitted a letter to the Court requesting permission to file a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and providing notice of an intent to raise an issue of German law pursuant to Federal Rule of Civil Procedure 44.1. (*See* Dkt. No. 14.) On August 13, 2015, counsel for Plaintiff submitted a letter to the Court in response. (*See* Dkt. No. 15.) On July 18, 2016, the Court entered a scheduling Order wherein the Court instructed Defendant to file his Motion To Dismiss by September 2, 2016, Plaintiff to file its response by October 21, 2016, and Defendant to file his reply by November 18, 2016. (*See* Dkt. No. 23.)

Defendant filed its Motion and supporting papers on September 2, 2016. (*See* Dkt. Nos. 24–27.) Plaintiff filed opposition papers on October 21, 2016, (*see* Dkt. No. 29–32), and Defendant filed a reply on November 18, 2016, (*see* Dkt. No. 33–34). On November 22, 2016, Plaintiff sought leave to file a sur-reply on the basis that Defendant's reply papers relied upon new information that "was available to Defendant at the time his underlying motion papers were filed." (Dkt. No. 36.)[4] On November 28, 2016, Defendant filed a letter in response to Plaintiff's request for leave to file a sur-reply. (*See* Dkt. No. 35.) On November 28, 2016, the Court

---

[4] Plaintiff's November 22, 2016 letter does not appear on the docket in its original form. However, a memo endorsed copy of this letter can be found at Docket Number 36.

5

entered an order permitting Plaintiff to file a sur-reply and instructed Plaintiff to file its sur-reply by no later than December 30, 2016. (*See* Dkt. No. 36.) Plaintiff proceeded to file its sur-reply on December 30, 2016. (*See* Dkt. No. 37.)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Choice of Law

Before considering the merits of a claim, a court must decide what law to apply to the case. *See Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989). The basis for subject matter jurisdiction in this case is diversity of citizenship pursuant to 28 U.S.C. § 1332. (*See* Compl. ¶ 4.) "A federal district court sitting in diversity jurisdiction must apply the choice-of-law principles of the forum state, in this case New York." *Fargas v. Cincinnati Mach., LLC*, 986 F.Supp.2d 420, 423 (S.D.N.Y. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941))*; see also Bigio v. Coca–Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) ("In cases where jurisdiction is based on the diversity

7

of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state, which is New York in this instance.")

Defendant argues that Plaintiff's Complaint should be dismissed because, according to Defendant, German law expressly forbids the type of non-competition provisions found in the Award Agreements by which Plaintiff may rescind any gains received within the Rescission Period and thereafter demand repayment. (*See* Def.'s Mem. of Law in Supp. Of Def.'s Mot. To Dismiss ("Def.'s Mem.") 10–13) (Dkt. No. 25).) Plaintiff notes, however, that the Performance Plan contains an express New York choice-of-law provision, which reads, in relevant part, "[t]he Plan and each Award Agreement shall be governed by the laws of the state of New York, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of the Plan to the substantive law of another jurisdiction." (Performance Plan at 9.) Defendant counters that because the non-competition provision "violates a fundamental policy of Germany, which has a materially greater interest than New York in resolving this dispute," the Court should disregard the express choice of law provision in favor of German law. (Def.'s Mem. 7.)

"New York law provides that, 'as a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored. It is as though the law of the selected jurisdiction were incorporated into the agreement by reference.'" *Granite Ridge Energy, LLC v. Allianz Global Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 391 (S.D.N.Y. 2013) (alterations omitted) (quoting *Freedman v. Chem. Constr. Corp.*, 372 N.E.2d 12, 15 (N.Y. 1977)); *see also Boss v. Am. Exp. Fin. Advisors, Inc.*, 791 N.Y.S.2d 12, 14 (App. Div. 2005) ("It is the well-settled policy of the courts of this State to enforce contractual provisions for choice of law . . ." (internal quotation marks omitted)), *aff'd*, 844 N.E.2d 1142 (N.Y. 2006). Generally,

8

under New York law, "a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000); *see also Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984) ("Under New York law . . . a contract's designation of the law that is to govern disputes arising from the contract . . . is determinative if the state selected has sufficient contacts with the transaction.")

However, "the 'choice of law principle that parties to a contract have a right to choose the law to be applied to their contract . . . is not absolute.'" *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 170 (S.D.N.Y. 2006) (quoting *S. Leo Harmonay, Inc. v. Binks Mfg. Co.*, 597 F. Supp. 1014, 1025 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 990 (2d Cir. 1985)). New York courts may override a contractual choice of law provision when "the chosen state has no substantial relationship to the parties" or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state." *Id.* (quoting *S. Leo Harmonay*, 597 F. Supp at 1025). This is a two-pronged inquiry, where, here, "[t]he Court must determine whether [German] law would govern this dispute in the absence of the parties' contractual choice-of-law provision; and, if so, the Court must decide whether the application of New York law would violate a fundamental public policy of [Germany]." *Beatie and Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006). The party seeking to invoke this doctrine bears the burden of showing that the policy in question is of such "overriding concern to the public policy of another jurisdiction as to override the intent of the parties and the interest of [New York] in enforcing its own policies." *Estee Lauder*, 430 F. Supp. 2d at 170 (quoting *Marine Midland Bank, N.A. v. United Missouri Bank, N.A.,* 643 N.Y.S.2d 528, 531 (App. Div. 1996)).

Pursuant to this exception, Defendant asserts that Germany has a materially greater interest in this dispute than does New York and that enforcement of the New York choice of law provision "would violate a fundamental policy of Germany against enforcing non-competition restrictions like the one set forth in the [Performance] Plan." (Def.'s Mem. 10.) Defendant relies upon *Prod. Resource Group L.L.C. v. Oberman*, No. 03-CV-5366, 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) and *SG Cowen Securities Corp. v. Messih*, No. 00-CV-3228, 2000 WL 633434 (S.D.N.Y. May 17, 2000), *aff'd*, 224 F.3d 79 (2d Cir. 2000), to argue that in the absence of the choice of law provision, German law would apply, based upon Germany's materially greater interest in the case and the predomination of German contacts. Yet, it is not as simple as Defendant suggests. Unlike *Oberman* and *Messih*, New York has substantial contacts with both the Parties, the exercise of the options, and the execution of the Performance Agreement.

The first portion of the inquiry requires the Court to employ the "substantial relationship" test. *Estee Lauder*, 430 F. Supp. 2d at 171. "[T]he New York Court of Appeals has held that while the parties' choice of law is to be given considerable weight, the law of the jurisdiction with the "most significant contacts" is to be applied. *S. Leo Harmonay*, 597 F. Supp. at 1025 (quoting *Haag v. Barnes*, 175 N.E.2d 441, 443) (N.Y. 1961)). Under this analysis, courts consider "the place of contracting; the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *SG Cowen Secs. Corp.*, 2000 WL 633434, at *3.

As a preliminary matter, IBM has a substantial presence in New York, including its corporate headquarters, corporate suite functions, and principal place of business. (*See* Compl. ¶ 1.) *See also Champion Auto Sales, LLC v. Polaris Sales Inc.*, 943 F. Supp. 2d 346, 351 n.3 (E.D.N.Y. 2013) (enforcing an agreement's Minnesota choice-of-law provision because, among

other reasons, the principal place of business of one of the parties to the agreement was in Minnesota); *Estee Lauder,* 430 F. Supp. 2d at 171–172 (distinguishing *Oberman* and *Messih* on the grounds that the company's "principal place of business, and not simply its headquarters, [was] located in New York"). Moreover, while Defendant did not himself work for IBM in New York, (*see id.* ¶ 2), the inclusion of the New York choice of law provision in the Award Agreements relates directly to stock options traded on the New York Stock Exchange, (*see* Stock Exercise Confirmations). IBM coordinated the distribution and payment of these Awards through its New York headquarters, (*see* 2003–2007 EAAs; 2011 EAA), and Defendant agreed to receive Awards pursuant to the New York choice of law provision in 2003, 2004, 2005, and 2007, (*see id.*). Each time an Award was deposited in his account, Defendant electronically sent his acceptance of the Award Agreements to New York, (*see id*), the result of which was that he assented to the contracts terms, including the New York choice of law provision, and thus "acquired equity ownership in a [New York] corporation headquartered in [New York]," *EMC Corp. v. Petter*, 104 F. Supp. 3d 127, 133 (D. Mass. 2015) (finding sufficient contacts in the jurisdictional context based upon an employee's assent to Massachusetts-based corporation's stock plan, coupled with delivery of the relevant contract to Massachusetts). The Awards then remained in Defendant's New York account until 2011, when he exercised the Awards and withdrew the vested equity from his New York account. (*See* Stock Exercise Confirmations.) Thus, the mere fact that Defendant is a German citizen and an employee of IBM's German subsidiary does not invalidate the terms of the Award Agreements, which involved Defendant partaking in the multiple aforementioned New York transactions between 2003 and 2011.

Moreover, Germany's interest in this matter is not materially greater than that of New York. Specifically, New York has a significant interest in "maintaining and fostering its

11

undisputed status as the preeminent commercial and financial nerve center of the Nation and the world" as well as protecting companies doing business here, such as IBM, by providing them with "access to a convenient forum which dispassionately administers a known, stable, and commercially sophisticated body of law [,which] may be considered as much an attraction to conducting business in New York as its unique financial and communications resources." *Estee Lauder*, 430 F. Supp. 2d at 173 (quoting *Marine Midland*, 643 N.Y.S.2d at 531). Upon consideration of these factors, the Court is disinclined to depart from the parties' choice of law in the Award Agreements at issue and cannot conclude that Defendant's location and work in Germany confers on Germany a materially greater interest in this action than on the State of New York.

Assuming, *arguendo*, that German contacts did predominate and German law would apply in the absence of the choice of law provision, the Court it is far from certain that giving effect to the Award Agreements' choice of law provisions would violate a fundamental policy of Germany. Defendant directs the Court to German Commercial Code (HGB) § 74(2), which "mandates that an employer must pay a former employee 50% of his previous contractual remuneration during the term of the restriction." (Def.'s Mem. 10.) According to Defendant, this provision of the HGB explicitly bars the type of post-contractual, non-competition provisions present in the Award Agreements, as the Award Agreements on their face lack any provision regarding the compensation of Defendant in exchange for his agreement to refrain from "Detrimental Activity" as defined by Section 13(a) of the Performance Plan. (*See id.* at 10–11.)

The Court has not found, and the Parties have not cited to, any legal authority construing the non-compete provisions of the German Commercial Code in a factual context similar to the

12

one in the case at bar.[5] Indeed, it is far from clear that such stock plans would even fall within the ambit of HGB § 74(2). Specifically, it appears that the literature regarding HGB § 74(2) acknowledges an unresolved debate regarding the applicability of HGB § 74(2) "in connection with stock option plans, in particular as regards post-contractual covenants not to compete." Thilo Mahnhold, *Choice of Law Provisions in Contractual Covenants Not to Compete: The German Approach*, 31 Comp. Lab. L. & Pol'y J. 331, 342 (2010). According to this literature, while the "prevailing view" is that non-compete provisions in stock option plans would fall under the same analytical framework as in an employment agreement, there is by no means a consensus on this issue. *Id.* at 333. In fact, one author acknowledges there are "no decisions by Germany's highest courts on this issue" and that "[t]he Rome I Regulation has not clarified this issue." *Id.* at 343. At the very least, there is a question as to the applicability of HGB § 74(2) of non-competition provisions in stock option plans akin to the Performance Plan, which would indicate the lack of a fundamental policy on the matter in the German courts.[6]

Defendant further argues that, irrespective of the HGB, the agreement is invalid because "the payment obligation to IBM constitutes a restriction of Mueller's freedom to terminate his

---

[5] The Parties have both submitted declarations from German law "experts" in support of their respective interpretations of the relevant portions of German law. However, because this is a Motion To Dismiss, the Court will not consider these opinions. *Leonard F.*, 199 F.3d at 107 ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)).

[6] Defendant's argument to the contrary is unpersuasive, as it relies upon a single German ruling, (*see* Def.'s Reply Mem. of Law in Further Supp. of Def.'s Mot. To Dismiss ("Def.'s Reply") 3 (Dkt. No. 33)), which is generally insufficient to create a fundamental policy, *see, e.g.*, *New Falls Corp. v. Lerner*, 579 F. Supp. 2d 282, 293 (D. Conn. 2008), *aff'd*, 352 F. App'x 596 (2d Cir. 2009) (holding that a ruling in one case was insufficient to find that the practice in question would violate a fundamental policy of the state).

13

employment agreement," and under German law, "an employer is not permitted to hinder or interfere with an employee's freedom to terminate his employment by threatening financial sanctions if he exercises his right to terminate." (Def.'s Mem. 11.) But Defendant makes no effort to show that repayment of stock earnings, not employment wages, would violate German law, nor does Defendant direct the Court to any German authority to support such a broad declaration. Moreover, Defendant asserts that the purpose of the stock options was to compensate employees for past service, (*see id.*), but again provides no support that the German courts have, or would, treat exercised stock options as wages.[7]

Ultimately, because there are sufficient and substantial contacts with New York, and the Court cannot say, as a matter of law, that enforcement of New York law would impair fundamental policy interests of Germany, the Court concludes that Germany's interest in this matter is not materially greater than that of New York's and therefore the New York choice of law provision is applicable in this Action.[8]

---

[7] Indeed, in New York, "[i]t has long been held that stock award plans like this one, whose objectives are to retain talented executives by providing them with a proprietary interest in the growth and performance of the company, are not 'wages.'" *Int'l Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613, 617 (S.D.N.Y. 1999). Even where an employee has already exercised the options and holds the cash proceeds, an employee may be divested of the profits earned "without running afoul of New York's prohibition against forfeiture of earned wages." *Id.* at 618.

[8] The Court is unpersuaded by Defendant's arguments regarding the enforceability of any judgment that this Court may ultimately render. As Plaintiff correctly notes, "the life of a judgment is long and what [is] true today may not be true tomorrow." (Pl.'s Mem. of Law in Opp'n to Mot. To. Dismiss ("Pl.'s Opp'n") 22 (quoting *Int'l Bus. Machs. Corp. v. Harrysson*, 116 F. Supp. 2d 485, 487 (S.D.N.Y. 2000).) Moreover, Defendant identifies no case law which indicates that the Court's determination as to the choice of law must weigh the possible enforceability of the action in a foreign court, and the Court will undertake no such inquiry today.

C. Employee Choice Doctrine

Under New York law, restrictive covenants of the kind found in the Award Agreements are "disfavor[ed] . . . in the employment context and [courts] will generally enforce them only to the extent they are reasonable and necessary to protect valid business interests." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). However, the Second Circuit has acknowledged an exception to this reasonableness inquiry under the employee choice doctrine, whereby "New York courts will enforce a restrictive covenant without regard to its reasonableness if the employee has been afforded the choice between not competing (and thereby preserving his benefits) or competing (and thereby risking forfeiture)." *Id.*; *see also Morris v. Schroder Capital Mgmt. Int'l,* 859 N.E.2d 503, 505–06 (N.Y. 2006); *Int'l Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613, 619 (S.D.N.Y. 1999) ("[I]n the context of a benefit compensation plan, New York recognizes an exception to the rule of reasonableness: the employee choice doctrine."). Under *Lucente*, however, if the employer failed to display a "continued willingness to employ the party who covenanted not to compete" or the employee was "involuntarily discharged without cause," that employer may not invoke the employee choice doctrine. 310 F.3d at 254–55.

Courts in the Second Circuit have directly addressed the applicability of the employee choice doctrine as applied to the enforcement of the non-compete provisions found in the exact Performance Plan at issue here. Those holdings in *Int'l Bus. Machines Corp. v. Smadi*, No. 14-CV-4694, 2015 WL 862212 (S.D.N.Y. Mar. 2, 2015) and *Martson* are instructive. In *Smadi*, the court addressed the exact Performance Plan as here, and found that the employee choice doctrine is applicable because, according to IBM's allegations, "Defendant was afforded the choice of continuing to receive Awards by refraining from competing with IBM, or forfeiting the monetary

15

value of Awards by competing with IBM." *Smadi*, 2015 WL 862212, at *3. In *Martson*, the court determined that the employee choice doctrine was applicable to Awards already exercised and paid out under the Performance Plan, and thus the non-compete provision was enforceable where the Defendant participated in Detrimental Activity in contravention of Section 13(a). 37 F. Supp. 2d at 620.[9]

Defendant argues that he was "given no choice between working for a competitor or forgoing the benefits at issue," (Def.'s Mem. 13), because of his agreement to a different non-competition provision in his Employment Agreement with IBM Germany. Based upon the facts alleged by Plaintiff at this stage, however, it would be inappropriate to find as a factual matter that Defendant was involuntarily discharged or that IBM displayed an unwillingness to employ Defendant going forward. Rather, had Defendant chosen not to engage in Detrimental Activity within the Rescission Period, as is alleged by Plaintiff, (*see* Compl. ¶¶ 10–12), he would not be subject to any action for forfeiture of his Awards.

### III. Conclusion

For the foregoing reasons, Defendant's Motion is denied. The Clerk of Court is directed to terminate the pending Motion. (Dkt. No. 24.)

SO ORDERED.

DATED: September 27, 2017
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[9] The court in *Martson* refrained from deciding the ultimate applicability of the employee choice doctrine in a Motion for Judgment on the Pleadings, because the court was "loath to conclude that Martson could not prove any set of facts" where he could allege involuntary discharge. 37 F. Supp. 2d at 620–21.

16